UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THOMAS E. PEREZ, Secretary of Labor,
United States Department of Labor,

Plaintiff,

v.

DARRYL HOWES, individually and doing business as DARRYL HOWES FARMS,

Defendant.
_____________________________________/

Case No. 1:12-CV-888

HON. GORDON J. QUIST

**OPINION**

Plaintiff, the Secretary of the United States Department of Labor (DOL), sued Defendant Darryl Howes, d/b/a Darryl Howes Farms, alleging violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), 29 U.S.C. § 1801 *et seq.*[1] Plaintiff claims that Defendant paid workers less than minimum wage, failed to keep adequate time records for workers, provided substandard housing to workers, and interfered with the DOL's investigation into his labor practices. In his amended complaint, Plaintiff seeks injunctive relief to require Defendant to comply with the FLSA's minimum wage and record keeping requirements, to comply with the MSPA's housing standards, and to allow the DOL to conduct investigations free from interference. Plaintiff further seeks to recover unpaid minimum wages to individuals that worked for Defendant and liquidated damages.

---

[1] Plaintiff originally sued Ron Howes as well, but Plaintiff and Ron Howes entered into a consent judgment. (Dkt. # 27.)

Plaintiff has moved for partial summary judgment, seeking a declaration that Defendant violated the FLSA and the MSPA, as well as injunctive relief. The motion does not seek unpaid wages. Defendant has filed a cross-motion for summary judgment, arguing that the workers were not employees under the FLSA, and thus the statute's minimum wage and record keeping requirements did not apply. Defendant further argues that he did not control the housing provided to the workers, and thus is not liable under the MSPA. Finally, Defendant asserts that he did not interfere with the DOL's investigation. For the reasons that follow, the Court will grant Plaintiff's motion and deny Defendant's motion.

## I. Background

A. The 2011 Harvest

Defendant has owned Daryl Howes Farms since 2009. (Def.'s Dep. at 4.) In 2011, Defendant grew 40 acres of cucumbers to be used for making pickles. (*Id.* at 6.) He sold all the cucumbers to a company owned by his cousin, Ron Howes, for $161,000. (*Id.* at 8, 10.)

During the 2011 harvest, Defendant employed 38 migrant workers (the workers) to harvest cucumbers. (*Id.* at 30.) Of those workers, 26 had worked for Defendant during the previous year's harvest. (*Id.* at 31-34.) Although Defendant generally expected workers to work for him exclusively during the cucumber harvest, six of the 38 workers worked additional jobs during the harvest. (*Id.* at 151-53.) One of the workers worked on the farm where he lived throughout the harvest. (*Id.*) Five of the workers worked nights at a cherry plant during the first one and one-half weeks of the harvest. (*Id.* at 153.)

Before beginning work, each worker received and signed an "independent contractor agreement" (the contract). (*Id.* at 21; dkt. # 17, Ex. L.) The contract provided that Defendant and the worker each would receive half the gross proceeds from the sale of the crop that the worker

harvested. (Dkt. #17, Ex. L.) The prices for the cucumbers were set by the buyer, and specified in an attachment to the contract. (*Id.*; Def.'s Dep. at 115.) All the workers accepted the rate in the contract, and none attempted to negotiate a different rate. (Def.'s Dep. at 115.) Under the terms of the contract, the most profitable cucumber to harvest was a "number two," which is a cucumber between one and one-half inches long. (*Id.*)

Before the workers arrived, Defendant disced and plowed the cucumber fields, planted cucumber seeds, and fertilized the fields. (*Id.* at 44-47.) Defendant paid about $10,000 for the cucumber seeds and fertilizer. (*Id.* at 46.) During the harvest, Defendant made all decisions regarding fertilization and irrigation of the fields, and did not involve the workers in these decisions. (*Id.*)

Before the harvest began, the workers organized a lottery system to determine which plot each worker would pick. (*Id.* at 61.) During the harvest season, the workers determined the days on which they would harvest cucumbers. (*Id.* at 52.) On very rainy days, for instance, some workers would harvest, while others would not. (*Id.*) Defendant did not believe he had the power to fire workers, even if they chose not to show up for work. (*Id.* at 43.)

On days when they harvested, some workers brought their own plastic dishwashing gloves and wheelbarrows. (*Id.* at 140-41.) Defendant provided other supplies, including collection boxes for the cucumbers, hoes, and buckets. (*Id.* at 136.) Defendant also provided portable toilets and hand-washing facilities. (*Id.* at 137-38.)

The workers placed cucumbers into collection boxes that Defendant provided. (*Id.* at 38, 136.) Defendant transported those boxes to the buyer using his own forklifts and trucks. (*Id.* at 38, 136.) Defendant oversaw the cucumber harvest, and spent time at the fields each day, typically two to three hours. (*Id.* at 44, 53.) While he was there, Defendant checked in with workers to see if they

were falling behind and observed whether they were working. (*Id.* at 53-54.) Defendant also sprayed chemicals, spread fertilizer, maintained irrigation equipment, repaired vehicles, loaded cucumbers, and checked the cucumber vines for disease. (*Id.* at 38, 51-54.) Defendant's employee, Mark Baccaria, assisted with these tasks. (*Id.*)

Defendant kept track of the hours that each worker worked on a weekly basis. (*Id.* at 94.) Once a week, he asked the workers how many hours they had worked during the previous week and recorded this number. (*Id.* at 94.) He then used this number to calculate their hourly wage. (*Id.* at 120.)

B. The "Green Camp"

In 2010, the Michigan Department of Agriculture fined Defendant for providing substandard housing to migrant workers. (*Id.* at 155-56.) The parties ultimately reached a settlement whereby Defendant agreed not to provide migrant worker housing in the future. (*Id.*)

Before the 2011 harvest, Ron Howes told Defendant that there were empty units at the "Green Camp," a property that Ron Howes' mother owned five miles west of the cucumber fields. (*Id.* at 26, 158.) Ron Howes told Defendant that Defendant's workers could rent the units, but that Ron Howes did not have time to fix the units before the harvest. (*Id.* at 158, 162.) Defendant agreed to authorize his employee, Mark Baccaria, to fix the units for rental. (*Id.* at 162.) Before the workers arrived, Baccaria replaced two refrigerators and some copper wire, performed some routine maintenance, and also cleaned some of the houses. (*Id.* at 176-77.)

The contract provided to the workers included an attachment stating that they could stay at the Green Camp for $25 per week payable to Ron Howes. (*Id.* at 24; dkt. # 17, Ex. L.) During the harvest, the workers living at the Green Camp reported problems with the units to Baccaria, who completed repairs and performed some routine maintenance. (Def.'s Dep. at 26; 178-79.) Defendant never went to the Green Camp during the 2011 harvest. (*Id.* at 26.)

On July 28, 2011, DOL Wage and Hour Inspectors (WHIs) inspected the Green Camp. (Enrico Decl. ¶ 19.) WHIs found, among other things, active bees nests, standing waste water, broken screen doors, unsanitary toilet facilities, broken showers, and debris throughout the camp. (*Id.*)

C. DOL's Investigation

On August 17, 2011, the DOL conducted an investigation at Defendant's cucumber fields. (Enrico Decl. ¶¶ 3-4; Jonaitis Decl. ¶¶ 3-4; Stewart Decl. ¶¶ 3-4.) Defendant asserts that this investigation was conducted as some sort of payback for his refusal the previous year to sign paperwork agreeing that his workers were employees. (Def.'s Dep. at 237; Def.'s Br. in Supp. of Mot. for Summ. J. at 9, 18.)

When they arrived, WHI Amanda Enrico told Defendant that the WHIs would be conducting an investigation and explained the process to him. (Enrico Decl. ¶ 5.) After meeting with Defendant, the WHIs interviewed workers in the cucumber fields. (*Id.* ¶ 7.)

About three hours later, Defendant began to get angry that the WHIs were still conducting interviews. (Def.'s Dep. at 200.) He wanted to figure out a way to get them to leave, so he called his friend, Dan Kilpatrick, who had a new camera, and asked him to come take pictures of the interviews. (*Id.*)

While WHI Enrico was interviewing a worker, Defendant drove up and parked about 15 feet away. (Enrico Decl. ¶ 9.) Kilpatrick was sitting in the passenger's seat holding a camera. (*Id.*) Although Enrico believed that it was a video camera, Defendant has testified that it was merely a digital camera. (*Id.*; Def.'s Dep. at 205.) WHI Enrico told Defendant that she could not record the interview, and Defendant responded that he would continue to take pictures and that the investigation was slowing down his workers. (Enrico Decl. ¶ 11; Def.'s Dep. at 207.)

Defendant and Kilpatrick then drove up to where WHI Jennifer Stewart was interviewing Baccaria. (Stewart Decl. ¶ 6; Def.'s Dep. at 207.) Defendant parked about five feet from where Stewart was conducting the interview. (Stewart Decl. ¶ 7; Def.'s Dep. at 208.) Stewart, believing that Kilpatrick had a video camera, told Defendant that he could not videotape the interview. (Stewart Decl.¶ 8.) Defendant then gave the camera to Baccaria, and told him to document what was happening. (Def.'s Dep. at 210.) Baccaria then refused to answer Stewart's questions, and Stewart terminated the interview. (Stewart Decl.¶ 8.)

Thereafter, Baccaria drove a forklift to where WHI Joseph Jonaitis was conducting an interview with a worker. (Jonaitis Decl. ¶ 6.) Baccaria parked the forklift about 10 feet away from where Jonaitis was conducting the interview and took out the camera. (*Id.* ¶¶ 7-8.) Jonaitis terminated the interview because of Baccaria's presence. (*Id.* ¶ 8.) Jonaitis then went to interview another worker, and Baccaria followed Jonaitis in the forklift. (*Id.* ¶ 9.) Jonaitis decided not to complete the interview because of Baccaria's presence. (*Id.*)

Shortly thereafter, the WHIs in the field met and determined that they could not complete any more interviews. (*Id.* at ¶ 9.)

## II. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor*

*Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. Discussion

This case is ripe for determination on summary judgment because there are no disputed issues of material fact. The record is comprised primarily of undisputed documents and the deposition testimony of Defendant. Although the parties disagree about how to characterize the facts, neither has argued that there are facts in dispute that would preclude summary judgment.

### ***FLSA Claims***

Plaintiff asserts that Defendant violated provisions of the FLSA that require employers to pay "employees" a minimum wage and to maintain records of hours worked. 29 U.S.C. §§ 206(a), 211(c). Defendant argues that the cucumber harvesters are independent contractors rather than employees, and that the provisions of the FLSA do not apply. Defendant further argues that, even if the workers were employees, they each received at least the minium wage. Defendant does not dispute that he failed to maintain records of the daily hours for each of the workers.

A. The Workers's Affidavits

In opposing Plaintiff's motion for summary judgment, Defendant filed 11 affidavits from individuals that worked for him during the 2011 harvest. (Dkt. ## 33-35.) Plaintiff moved to strike those affidavits, arguing that Defendant never disclosed the names and contact information of the workers in his Rule 26(a)(1) disclosures or in response to Plaintiff's interrogatories, nor did Defendant supplement his disclosures with the information. Defendant did not respond to Plaintiff's motion to strike within the 14-day time period specified by the Local Rules. W.D. Mich. L. Civ. R. 7.3(c). Rather, Defendant waited until over three months had passed, and then filed a response opposing Plaintiff's motion. Plaintiff moved to strike that response at untimely.

The Court will grant Plaintiff's motion to strike Defendant's response. The response was filed over two months past the deadline, without any explanation for its untimeliness. The Court will also grant Plaintiff's motion to strike the affidavits. A party that fails to provide information or identify a witness may not use that witness to supply evidence on a motion, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c). Defendant should have provided information about the workers at several points during discovery, and failed to do so. Defendant may not now rely on their affidavits.

B. Whether the Workers Are Employees

"Whether an employment relationship exists under a given set of circumstances is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (internal quotations omitted). Rather, courts focus on the "economic reality" of the relationship between the parties to determine whether it is an employment relationship. *Id.* "[I]n distinguishing between employees and independent contractors, courts have focused on whether, as a mater of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Id.* at 523 (internal quotations omitted).[2]

Courts consider six factors in determining whether a worker is an employee or an independent contractor:

(1) the degree of permanency and duration of the relationship between the parties;

(2) the degree of skill required for rendering the services;

(3) the worker's investment in equipment or materials required for the task;

[2] The FLSA defines an "employee" as "any individual employed by the employer." 29 U.S.C. § 206(e)(1). It further defines employ as "to suffer or permit work." 29 U.S.C. § 206(e)(g). However, the Sixth Circuit has noted that those definitions are "exceedingly broad and generally unhelpful." *Laurelbrook*, 642 F.3d at 522.

(4) the worker's opportunity for profit or loss depending on his skill;

(5) the nature and degree of the alleged employer's control over the worker's performance; and

(6) the extent to which the services rendered are an integral part of the alleged employer's business.

*See Donovan v. Brandel*, 736 F.2d 1114, 1117 & n.5 (6th Cir. 1984); *Cavazos v. Foster*, 822 F. Supp. 438, 442 (W.D. Mich. 1993). No one factor is determinative. *Laurelbook*, 642 F.3d at 523. Rather, all the factors are applied to determine the "dependence of alleged employees on the business with which they are connected." *Id.*

Courts in this circuit have addressed the employment status of migrant workers, including pickle harvesters, on several occasions. In *Brandel*, the district court, after trial, found that the migrant workers who worked for the defendant during the pickle harvest were independent contractors rather than employees. *See Brandel*, 736 F.2d at 1116. The Sixth Circuit affirmed, explaining that the case presented "unique" facts, and that any such determination must be made on a case-by-case basis. *Id.* at 1120. The court noted that a different result was reached in a district court case involving pickle harvesters, *Donovan v. Gillmor*, 535 F. Supp. 154 (N.D. Ohio 1982), "upon a record strikingly different tha[n] the thorough and pointed evidence" in the case before the court. *Id.* Since *Brandel* was decided, several district courts in this circuit have held that migrant workers are employees. *See Cavazos v. Foster*, 822 F. Supp. at 441 (collecting cases). Two of these cases addressed the status of pickle harvesters specifically. *See id.*; *Elizondo v. Podgorniak*, 70 F. Supp. 2d 758 (E.D. Mich. 1999).

With this background in mind, the Court will address each of the factors used to determine employment status.

1. Permanency and duration of the relationship

Courts have reached differing conclusions in addressing this factor in the context of seasonal workers. In *Brandel*, the court found that the harvesters had only a temporary relationship with the defendant. *Brandel*, 736 F.2d at 1117. In making this finding, the court noted that many of the harvesters would simply show up at the defendant's farm looking for work, several of the harvesters held full-time jobs elsewhere and considered the harvest an opportunity to supplement their incomes, and many of the harvesters had only harvested pickles for one year. *Id.* The court noted that, although 40 to 50 percent of the harvesters returned to the defendant's farm annually, that fact merely signified a "mutually satisfactory arrangement," rather than an employment relationship. *Id.*

In *Cavazos*, however, the court reached a different conclusion. *Cavazos*, 822 F. Supp. at 443. Noting that the 70 percent return rate for harvesters was "remarkably high" for seasonal workers, and that the 120 day harvesting season was longer than the 30 to 40 day season at issue in *Brandel*, the court concluded that this factor weighed in favor of an employee relationship. *Id.* at 444. Other courts have concluded that, because pickle harvesting is inherently seasonal, an exclusive season-long relationship is indicative of permanency. *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987); *Donovan v. Gillmor*, 535 F. Supp. 154, 162-63 (N.D. Ohio 1982).

This case appears to fall somewhere between the cases cited. Defendant testified that most workers simply showed at up his farm looking for work. The harvest lasted only 45 days, but most of the workers worked for the entire harvest.[3] The great majority of the workers worked solely at

---

[3] Defendant issued a paycheck to 32 workers for the first week of the harvest, and 30 workers for the final week of the harvest. (Dkt. # 30, Ex. B, C, E.) Although Defendant claims that 29 workers worked during the first week of the harvest and only 13 worked during the last week, the check stubs that Defendant cited in support of this proposition (dkt. # 20, Ex. N) are incomplete. (*See* Dkt. # 30, Ex. B.)

the cucumber harvest, and those that worked at the cherry plant only did so for a short period.[4] Moreover, there is no indication that the workers had other full-time jobs throughout the harvest, or that they used the cucumber harvest merely to supplement their income.

Under the circumstances, the Court finds that this factor does not weigh heavily in favor of either party.

2. Degree of skill

"The *Brandel* court stands alone in finding the skill required for pickle harvesting to weigh in favor of finding an independent contractor relationship." *Elizondo*, 70 F. Supp. 2d at 768. In making that finding, the *Brandel* court relied in part upon the fact that the harvesters were solely in charge of the fields on a daily basis, and were thus required to monitor the need for irrigation and insecticide. *Brandel*, 736 F.2d at 1117-18. Moreover, the court noted that it was "uncontroverted" that workers required at least one season's experience to obtain the judgement necessary to productively manage the harvesting of pickles. *Id.* Without those unique facts, however, other courts have universally concluded that pickle harvesting does not require special skills. *See Lauritzen*, 835 F.2d at 1537 ("Although a worker must develop some specialized skill in order to recognize which pickles to pick when, this development of occupational skills is no different from what any good employee in any line of work must do."); *Cavazos*, 822 F. Supp. at 443 ("The only human capital the migrant workers are expected to contribute is their native intelligence, their willingness to work long hours in the fields, and the labor of their family members."); *Gillmor*, 535 F. Supp. at 162 ("No special training or experience is necessary to perform the task of picking pickles.").

[4] Defendant argues that it is relevant that nearly all of the workers also worked in a cherry plant for four weeks during the 2013 harvest. He acknowledges, however that this was an aberration from the normal course because the cherry harvest was late in 2013. (Def.'s Dep. at 154.)

In this case, the record demonstrates that pickle harvesting did not require special skills. Although Defendant asserts that workers were responsible for caring for and training the plants, this is belied by the record. The contract specified that the workers were required "to be watchful of the crops daily needs and communicate those needs" to Defendant. (Dkt. # 17, Ex. L.) However, once workers notified Defendant of their concerns, Defendant was responsible for checking the vines. There is nothing to indicate that the workers cared for the plants or did anything more than report problems to Defendant. Thus, the circumstances in this care are unlike those in *Brandel*, where workers were in charge of managing the fields day-to-day.

Furthermore, Defendant admitted that he could train a worker to pick pickles in an hour. (Def.'s Dep. at 148-49.) Although Defendant clarified that it would take more time to become efficient at pickle harvesting (*id.*), that fact does not indicate that it required a high degree of skill. A worker will become more efficient at almost any job with experience, whether that job requires great skill or not.

In this case, the record demonstrates that pickle harvesting did not require a high degree of skill. This factor therefore weighs in favor of a finding that the workers were employees.

3. Worker's investment

The record is clear that Defendant's investment dwarfed that of the workers. The workers were not required to provide any of their own equipment, although many supplied their own dishwashing gloves, and some brought their own wheelbarrows. In contrast, Defendant supplied hoes, collection boxes, and the forklifts used to lift the boxes.[5]

[5] Defendant also made significant investments before the harvest began. However, the *Brandel* court considered only the investment made during the harvest. *Brandel*, 736 F.2d at 1118. Although other courts have criticized this approach, *see Elizondo*, 70 F. Supp. 2d at 769, it is unnecessary to look beyond the harvest season in this case.

Defendant admits that the workers' capital investment in gloves and wheelbarrows was minimal, but argues that the Court should consider the "personal capital" invested by the workers, who had to leave home, travel long distances, and be away from their families. Even if the Court were inclined to consider those circumstances, however, there is nothing in the record supporting an expenditure of "personal capital." Accordingly, this factor weighs in favor of the workers being considered employees.

4. Opportunity for profit or loss

Defendant agrees that the workers had no risk of loss from the "aspect of capital inputs," but argues that the Court should take into account the investment of time and travel. Defendant fails to point to any case law supporting this approach, and the Court found none. Furthermore, Defendant has not pointed to any evidence in the record demonstrating the extent of such an investment. Like other courts that have addressed this issue, the Court finds that "there is little, if any, evidence in the record to support the finding that these workers are actually exposed to any risk of loss." *Brandel*, 736 F.2d at 1119.

In *Brandel*, the court found that the harvesters had an opportunity for profit because their earnings would increase if they successfully managed the fields. *Id.* In this case, however, the workers did not manage the fields, and thus did not have this opportunity. Rather, the circumstances of this case are more in line with those in which courts have found that there was no opportunity for profit. *See Lauritzen*, 835 F.2d at 1537; *Elizondo*, 70 F. Supp. 2d at 770-71; *Cavazos*, 822 F. Supp. at 443. Workers were paid according to how many pickles they picked. They had no input into selecting a buyer or negotiating a price for the pickles. Under the system in place, workers could simply increase their wages by working longer, harder, and smarter—this does not constitute an

opportunity for profit. Accordingly, this factor weighs in favor of a finding that the workers were employees.

5. Defendant's control

In *Brandel*, the court found that the evidence established that the harvesters had entered into a sharecropping arrangement whereby the farm owner relinquished control to the harvesters. *Brandel*, 736 F.2d at 1119. In making that finding, the court emphasized that the harvesters negotiated for a particular parcel of land, as well as for the defendant to plant pickles at a specific time to accommodate the schedules of the harvesters. *Id.* The court also noted that the defendant did not appear in the fields to supervise the day-to-day operations, and that he did not dictate work hours. *Id.*

In contrast, other courts have found that the farm owner—rather than the harvesters—retained control. In *Cavazos*, the court found it relevant that the defendant made row assignments to the harvesters, retained the power to fire workers, spent time in the fields during the harvest, and monitored the health of the vines and the need for irrigation. *Cavazos*, 822 F. Supp. at 443. In *Elizondo*, the court emphasized that the defendant made plot assignments based on a preference for long-time employees, monitored the fields to determine if the harvesters were on schedule, retained responsibility for irrigation, insecticide, and fertilization, and had exclusive control over negotiations with the buyer. *Elizondo*. 70 F. Supp. 2d at 772.

Again, this case falls somewhere between *Brandel* and those cases that reached the opposite conclusion. Defendant testified that he did not assign rows to workers, did not dictate their work hours, and did not retain the power to fire them. However, the workers did not negotiate with Defendant for particular parcels of land, nor did they negotiate with him regarding the timing of the harvest. Defendant spent significant time in the fields each day, and while he may not have closely

monitored the workers' progress, he did observe whether they were falling behind. Finally, Defendant was responsible for the health of the vines, and determined the need for irrigation and insecticide. Although there are some similarities with *Brandel*, the facts of this case diverge in important ways. Accordingly, this factor weighs in favor of a finding that the workers were employees.

6. Services as an integral part of Defendant's business

In 2011, Defendant derived 84 percent of his income from pickle farming. Defendant could not reasonably dispute that the workers' services during the cucumber harvest were an integral part of his business, nor does he make such an attempt. Rather, he argues that the decision in *Brandel* requires the Court, in analyzing this factor, to determine whether the workers were economically dependent upon him. Defendant misinterprets the language in *Brandel*, however. The *Brandel* court determined that the harvesters' services were integral, but that this factor was not determinative. *Brandel*, 736 F.2d at 1120. It then went on to examine the "central question" of whether the workers were dependent upon the defendant's business. *Id.*

While recognizing that this "is only one factor in determining the question of employment status," *id.*, the Court finds that this factor supports finding an employment relationship exists.

7. Economic Reality

The six factors discussed are intended to get at the "central issue" of whether the workers were economically dependent upon Defendant. *See Brandel*, 736 F.2d at 1120; *Cavazos*, 822 F. Supp. at 444. The factors weigh in favor of a finding that the workers were employees, and the record supports a finding that the workers were dependent on Defendant, rather than in business for themselves. This was not a sharecropper relationship as in *Brandel*, but rather an employment relationship in which the workers' wages were dependent upon their production. Such a payment

structure, on its own, does not transform an employee into an independent contractor. The "economic reality" of the situation indicates an employer-employee relationship. Accordingly, the Court concludes that the workers were employees, and thus subject to the protections of the FLSA.

Plaintiff has not moved for summary judgment on his claim that Defendant paid the workers less than the minimum wage, and the Court expresses no opinion on that issue.

C. Defendant's Record Keeping

The FLSA requires Defendant to keep records documenting the hours that each employee works daily and weekly. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Defendant admits that, during the 2011 harvest, he did not keep records of hours worked each work day. Rather, he asked "each worker on a weekly basis how many hours they had worked the previous week and calculate[d] the hourly earnings." (Def.'s Br. in Supp. of Summ. J. at 6; *see also* Def.'s Dep. at 87.) Accordingly, the Court concludes that Defendant violated the record keeping provisions of the FLSA.

Plaintiff requests an injunction requiring Defendant to comply with the FLSA's record keeping requirements. *See* 29 U.S.C. § 217 (giving trial courts discretion to enjoin FLSA violations). The issuance of an injunction under the FLSA is within the reasonable discretion of the trial court. *Martin v. Funtime*, 963 F.2d 110, 114 (6th Cir. 1992). "The imposition of an injunction is not punitive, nor does it impose a hardship on the employer since it requires him to do what the Act requires anyway – to comply with the law." *Id.* (internal quotations omitted). In determining whether to issue an injunction, the central issue is whether the violations are likely to reoccur. *Id.* "A dependable, bona fide intent to comply, or good faith coupled with extraordinary efforts to prevent recurrence" weigh against granting an injunction, while "an employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction." *Id.* (internal quotations omitted). Thus, in exercising its discretion, a court should

consider: "(1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994).

During a previous investigation, a WHI instructed Defendant to keep accurate records and provided him with publications detailing how to do so. Nonetheless, Defendant has failed to comply with the requirements of the FLSA. In this case, the factors that weigh against granting an injunction are not present – Defendant has not made a dependable effort to comply, nor has he made efforts to prevent recurrence. Defendant has not even indicated that he will attempt to comply with the FLSA going forward, let alone promised to do so. Moreover, Defendant has previously violated the FLSA, and did not respond to the government's efforts to remedy this violation without legal action. Accordingly, the Court finds that an injunction is warranted.

***MSPA Claims***

A. <u>Housing at the Green Camp</u>

Section 203(a) of the MSPA requires "each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers" to ensure that the facility complies with applicable health and safety standards. 29 U.S.C. § 1823(a). A person controls a facility if the person "is in charge of or has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee." 29 C.F.R. § 500.130. If more than one person is involved in providing housing, both persons are responsible for ensuring that it meets applicable housing standards. *Id.*

The MSPA is a remedial statute, "enacted in response to the exploitive practices that historically plagued the migrant agricultural labor market." *Becerra Hernandez v. Flor*, No. Civ. 01-183 (PSM/LE), 2002 WL 31689440, at *9 (D. Minn. Nov. 29, 2002). The history and purpose

of the statutory scheme is "to make agricultural employers and farm labor contractors responsible for the fair treatment of migrant workers." *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 615, n. 43 (W.D. Tex. 1999). As such, Congress intended that the term "control" be interpreted "with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing . . . is responsible for maintaining that facility." H.R. REP. NO. 97-885 at 17-18 (1982). Indeed, "the disjunctive phrase – 'authority to oversee, manage, superintend or administer' housing – sweeps in more activities than those traditionally relegated to a landlord." *Case Farms*, 96 F. Supp. at 614. Courts have adopted an expansive interpretation of this requirement, and resolved any ambiguities in favor of migrant workers. *Id.*

In this case, the DOL found nine separate housing violations at the Green Camp. Defendant does not dispute the violations, but argues that he is not liable under the MSPA because he did not own or control the property. Defendant asserts that he never went to the property in 2011, and that his only connections with the property were that some of his workers stayed there and that he authorized Baccaria, his employee, to get the property ready for the workers to arrive and make repairs.

The applicable regulations state that an individual is deemed to have control over the property if he has authority to "oversee, manage, superintend, or administer" the facility through an authorized agent. 29 C.F.R. § 500.130. In this case, Baccaria had the authority to prepare the property for the workers and to make repairs once the workers arrived. Because he performed those activities within the scope of his employment with Defendant, the activities are attributable to Defendant. *See Castillo*, 96 F. Supp. 2d at 615-16 . Accordingly, the Court concludes that Defendant controlled the Green Camp, and was required to ensure compliance with the MSPA.

B. DOL's Investigation

The Secretary may "investigate, and in connection therewith, enter and inspect such places . . . , question such persons and gather such information to determine compliance" with the MSPA. 29 U.S.C. 1862(a). An individual may not "unlawfully resist, oppose, impede, intimidate, or interfere with any official of the [DOL] assigned to perform an investigation" without violating the MSPA. 29 U.S.C. 1862(c).

Plaintiff argues that Defendant attempted to interfere with the DOL's investigation by stalking the WHIs in his truck, having Baccaria stalk the WHIs in the forklift, and videotaping the interviews. Plaintiff points to a district court case noting that "videotaping and the presence of supervisors during interviews would unreasonably interfere with the Secretary's ability to interview migrant workers." *See Perez v. Blue Mountain Farms*, No. CV-13-5081-RMP, 2013 WL 4048537, at *6 (E.D. Wash. Aug. 9, 2013). In that case, the court ordered the defendant not to record interviews or send supervisors to observe the interviews, and required that interviewers be given some distance to maintain privacy during the interviews. *Id.*

Defendant argues that he did not attempt to record or listen to the interviews, but only to photograph them. Defendant further asserts that the DOL cannot argue that it was attempting to maintain confidentiality because it conducted the interviews in plain sight. Finally, Defendant argues that the Court should consider the "threat" that WHI Enrico made in 2010.

Defendant's arguments are unavailing. He has admitted that he approached the WHIs in the field for the purpose of getting them to leave his property. Although Defendant claims he never tried to listen to the interviews, he parked in such close proximity that he would inevitably hear what was being said. Although the WHIs conducted the interviews in "plain sight," the record indicates they intended that the interviews remain confidential. No matter where the WHIs conducted the

interviews, Defendant knew that his workers were the subject of the interviews. Thus, it was the content of the interviews—and not the subjects—that the WHIs intended to keep confidential. Finally, the "threat" made by WHI Enrico indicates only that the DOL had concerns that Defendant was not complying with the law, and thus it is no surprise that the DOL decided to investigate.

In the end, Defendant attained his goal—the WHIs concluded that they could not successfully complete the interviews and they cut their investigation short. Under the circumstances, the Court finds that Defendant interfered with the DOL's investigation.

C. Injunctive Relief

The MSPA authorizes the Secretary to petition for injunctive relief if he determines that the MSPA has been violated. *See* 29 U.S.C. § 1852(a). Plaintiff requests an injunction prohibiting Defendant from violating the MSPA's requirement for housing and from interfering with the DOL's future investigations. A court considers four factors in determining whether to issue an injunction: (1) the plaintiff's success on the merits; (2) whether the plaintiff may suffer irreparable harm absent an injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction on the public interest. *See Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012); *see also Metzler v. Lykes Pasco, Inc.*, 972 F. Supp. 1438, 1445 (S.D. Fla. 1997) (applying injunction factors to an MSPA claim).

As discussed, Plaintiff has succeeded on the merits of the MSPA housing claim. Congress has tasked Plaintiff with protecting the rights of migrant workers and ensuring that they are not subject to unhealthy housing conditions. Plaintiff, and the workers he must protect, will suffer irreparable injury if Defendant does not comply with the law. Defendant will not suffer any harm from an injunction, since it merely requires Defendant to do what is already required of him. Finally, as Congress has already determined, requiring those that own or control housing to satisfy

health and safety standards will serve the public interest. Granting an injunction will further serve this interest by ensuring that Defendant satisfies his obligations under the MSPA.

The analysis for the MSPA interference claim is similar. Plaintiff has demonstrated success on the merits. Plaintiff will suffer irreparable harm if not permitted to conduct a thorough investigation, because the DOL cannot fulfill its statutorily-mandated duty to investigate potential violations of the MSPA without the ability to investigate and speak with workers in the fields. Defendant will suffer little harm, as an injunction would merely require him to comply with the law. Although a DOL investigation may cause some delays in Defendant's farming operation, Congress has already determined that such inconveniences are necessary to ensure the protection of migrant workers. Finally, an injunction will serve the public interest by allowing the DOL to investigate potential violations of the MSPA.

Accordingly, the Court concludes that the Secretary is entitled to an injunction on its MSPA claims.

## IV. Conclusion

The Court finds that the workers who harvested Defendant's 2011 cucumber crop were employees under the FLSA, and thus entitled to the protections of that statute. Defendant did not comply with the FLSA's record keeping requirements, specifically the requirement that Defendant keep track of the daily hours worked by each employee. The Court further concludes that Defendant did control the "Green Camp" housing where many of his workers lived during the 2011 harvest, and thus is liable for the MSPA violations that occurred there. Finally, the Court concludes that Defendant interfered with the DOL's investigation in August 2011, in violation of the MSPA.

Accordingly, the Court will grant the Secretary's motion for summary judgment, and deny Defendant's motion. Defendant shall keep records that comply with the FLSA's record keeping

requirements. Specifically, Defendant shall keep accurate records of the hours that each of his employees works daily and weekly. To the extent that Defendant owns or controls any housing provided to migrant workers, he shall ensure that such housing complies with the MSPA. Finally, Defendant shall allow the DOL to conduct investigations without interference. Specifically, Defendant shall not record any interviews, or instruct others to record such interviews. Defendant shall further ensure that investigators are provided sufficient space to privately interview any migrant worker or other employee.

A separate order will issue.

Dated: March 17, 2014

/s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE